

NUMBER 13-17-00683-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**FELICIANO CRUZ,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

### On appeal from the 214th District Court of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Longoria and Perkes
### Memorandum Opinion by Chief Justice Contreras

Appellant Feliciano Cruz was convicted of murder, a first degree felony, and tampering with physical evidence, a third degree felony. *See* TEX. PENAL CODE ANN. §§ 19.02, 37.09. On appeal, he argues: (1) the evidence was insufficient to support the murder conviction; (2) the indictment "failed to charge felony murder properly" and an

invalid charge was submitted to the jury; (3) the punishment charge "exaggerated the effect of good conduct time" and caused egregious harm; (4) his trial counsel provided ineffective assistance; and (5) the trial court erred by allowing trial spectators to wear "expressive clothing." We affirm.

## I. BACKGROUND

A Nueces County grand jury returned an indictment alleging that appellant, while "in the course of and in furtherance of the commission or attempt of" a felony, intentionally or knowingly committed an act dangerous to human life that resulted in the death of Monica Ramos (Count I). *See id.* § 19.02(b)(3). The predicate felony was specified in the indictment as "aggravated assault or injury to a child," and the act dangerous to human life was specified as "striking [D.C., appellant's daughter,] with a loaded firearm." Based on the same incident, the indictment also alleged manslaughter, aggravated assault, and injury to a child (Counts II, III, and IV, respectively). *See id.* §§ 19.04, 22.02, 22.04. Finally, the indictment alleged that appellant, knowing that an offense had been committed, intentionally or knowingly concealed a firearm with intent to impair its verity or availability as evidence in a subsequent proceeding related to the offense (Count V). *See id.* § 37.09.

At trial, A.G. testified that, on her sixteenth birthday on July 7, 2016, she went to the house of her fourteen-year-old friend, D.C. Ramos, a friend of appellant who was thirty years old, was at the house. Appellant came to the house and then left with A.G. and D.C. to drive them to a store. According to A.G., while driving to the store, appellant was "swerving" and "going in both lanes." The store was closed, but D.C. saw some of her friends there, and they started talking outside of the car. Meanwhile, appellant fell

2

asleep in the driver's seat and A.G. waited in the back seat.

A.G. stated that, at that point, Ramos then arrived and started talking to appellant. Ramos made appellant get in the passenger seat and told D.C. to get back in the car. According to A.G., Ramos wanted to drive and was "mad" because appellant was "driving, I guess, intoxicated or something." At some point, D.C. realized she had lost her phone, so the group went back to the area of the store to look for it. D.C. eventually found her phone, but appellant took the phone away, insulted her, and told her to walk home. D.C. got out of the car and started walking on the left side of the road. Ramos followed behind, driving slowly. From the back seat, A.G. then saw D.C. take a rock and threaten to break the window of the car. At that point, appellant exited the car with a gun and began "hitting [D.C.] with the gun and his hands." A.G. clarified that appellant hit D.C. five or six times with the "back of the gun" on the top of her head; he was also "pulling her hair and hitting her with his hand." A.G. explained that this assault went on for about thirty seconds.

A.G. then heard two gunshots about three seconds apart, and she heard Ramos tell appellant, "You shot me." Ramos, who was in the driver's seat at the time the shots were fired, was bleeding and gasping for air, and she slumped out of the car. Appellant took his shirt off and wrapped it around Ramos. He then threw his gun "in the gutter" and he told D.C. and A.G. to lie to police, though he did not specify what exactly they should say. When police first questioned A.G., she falsely told them she did not know what happened because she was scared of appellant. She later told police the truth at the police station, where she "felt more safe."

A.G. said that appellant and D.C were standing still immediately after the shots were fired, but she confirmed that appellant was in the process of assaulting D.C. as the

3

shooting took place. She acknowledged on cross-examination that she put her head down for a few seconds toward the end of the assault because she thought she was going to get shot. She also conceded that she initially told police that the gunshot came from outside the car while appellant was in the car. When A.G. later spoke to D.C. about the incident, D.C. was crying and was worried about what would happen if appellant "gets in trouble."

D.C., who was fifteen years old at the time of trial, testified that after A.G. came to her house, appellant drove the girls to a store. Because appellant was "swerving," D.C. believed appellant "was under the influence of something" and so she called Ramos. Ramos came and told appellant to get in the passenger seat. After D.C. realized she lost her phone, Ramos drove the group back to the store. At some point, D.C. got into an argument with appellant, and appellant told her to walk home despite the fact that she was not wearing shoes. D.C. started to walk and then "picked up a rock" and "threatened" appellant, saying: "Leave me alone or I am going to throw this rock at your window." At that point, according to D.C., appellant

> pointed the gun at me and then I just told him to pull the trigger. And then he got off the car from the passenger side and then he came to where I was on the driver's side. And [Ramos] opened the door and she said, Get in before your dad gets mad. And then so I was going to get in the car and then he pulled me out . . . [b]y my hair. And then he started hitting me with his gun and then it just went off.

When asked where on her body appellant hit her with the gun, D.C. replied: "I don't remember; I didn't feel nothing. It just happened too quick." She later agreed that appellant was hitting her "over the head" and that she was covering her head with her arms. Photos entered into evidence showed that she had some small scratches on her hand after the incident.

4

Like A.G., D.C. testified that she initially did not tell police the truth because she was scared, but she later told a detective the truth about what happened. D.C. denied that appellant verbally told her to lie to police. However, she agreed that she sent Facebook messages to her boyfriend in November 2016 stating "My dad wants me to lie in court about what happened" and "He wants me to say he never had the gun and [Ramos] had the gun the whole time." D.C. also sent a message to another friend describing the July 8 incident in detail and consistently with her trial testimony. She explained in the message that appellant was "all barred out" at the time and that she initially lied to police because she was living with appellant and "didn't want them to take him."[1]

On cross-examination, D.C. recanted her earlier testimony that appellant never told her to lie. By way of explanation, she stated: "I don't remember because I don't like to think about the whole situation. So I just forget things and then I just don't remember them until I see them again."

Police recovered a broken car door handle, two bullet casings, and a large rock from the area where the incident took place. The door handle had been broken off from the passenger-side front door of appellant's car. Officers also located a Glock handgun at the bottom of a storm drain near appellant's car and a corresponding ammunition magazine under the driver's seat of the car. Appellant's roommate testified that he reported that exact handgun stolen in May of 2016; he suspected appellant or appellant's brother stole the gun because the theft did not involve a forced entry, there was no sign

---

[1] D.C. testified she deleted these messages. However, they were obtained from Facebook pursuant to a search warrant.

of burglary, and appellant was his only roommate.[2]

The medical examiner testified that Ramos died from a gunshot wound to the chest, and she also suffered a gunshot wound to her left forearm. A firearms examiner from the Corpus Christi Police Department testified that he test-fired the gun found at the scene and determined it was the source of the casings recovered by police. A gunshot residue analyst determined, based on evidence collected from appellant, that appellant "fired a weapon, was in the immediate proximity of a weapon as it was being fired[,] or came into contact with a surface that had gunshot residue particles on it" within four hours before the evidence was collected. Another officer testified that, while being transported to the police station that night, appellant admitted to using Xanax and claimed that he was asleep in the car at the time Ramos was shot.

The jury found appellant guilty on all five counts. It sentenced appellant to life in prison on Count I and ten years' imprisonment on Count V,[3] and the trial court ordered the sentences to run concurrently. Appellant filed a motion for new trial which was denied by operation of law after a hearing. See TEX. R. APP. P. 21.8(c). This appeal followed.

## II. DISCUSSION

### A. Evidentiary Sufficiency

Appellant contends by his first issue that the evidence was insufficient to support his conviction for murder. In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime

---

[2] Appellant's roommate testified that, when he asked appellant about the gun, appellant "just got angry."

[3] The State abandoned Counts II, III, and IV prior to the punishment phase.

6

beyond a reasonable doubt. *Griffin v. State*, 491 S.W.3d 771, 774 (Tex. Crim. App. 2016); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Brooks*, 323 S.W.3d at 899; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

In his sufficiency argument, appellant observes that the jury charge incorrectly stated that injury to a child requires a showing that the victim was "younger than fourteen (14) years of age." In fact, for purposes of the predicate felony offense of injury to a child, "child" means "a person 14 years of age or younger." *Id.* § 22.04(c)(1).[4] But sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). Here, a hypothetically correct charge would instruct the jury to find appellant guilty of felony murder as alleged in Count I if: (1) he committed or attempted to commit aggravated assault or injury to a child, and (2) in the course of and in furtherance of the commission or attempt, he committed or attempted to commit an act clearly dangerous to human life that caused Ramos's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). It would state that a person commits aggravated assault if he intentionally, knowingly, or recklessly causes bodily injury to another while using or exhibiting a deadly weapon. *Id.* § 22.02(a)(2). And it would state that a person commits the offense of injury to a child if he intentionally,

_____

[4] The correct statutory definition of "child" was set forth twice elsewhere in the charge, including in the application paragraph.

knowingly, recklessly, or with criminal negligence causes "a person 14 years of age or younger" to suffer bodily injury. *Id.* § 22.01(a)(1), 22.04(a), (c)(1).

Appellant notes that D.C. testified she "felt nothing" when appellant struck her with the gun. Appellant also argues that D.C. "suffered no visible injuries," though she testified that she had a small abrasion on her arm which she thought was as a result of the gun going off. Appellant argues that, in light of this evidence, no reasonable juror could find beyond a reasonable doubt that appellant "assaulted" his daughter. We construe this argument as challenging the sufficiency of the evidence to support a finding that he caused D.C. to suffer "bodily injury." *See id.* §§ 22.01(a)(1), 22.02(a)(2), 22.04(a).[5]

"Bodily injury" means "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8). "Any physical pain, however minor, will suffice to establish bodily injury," *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012), as will "even relatively minor physical contacts so long as they constitute more than mere offensive touching." *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989). And "[a] fact finder may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some of the natural causes of it." *Id.* Here, although D.C. testified that she "didn't feel nothing" when appellant hit her with the gun, the jury could have disbelieved that testimony. *See Lancon v. State*, 253 S.W.3d 699,

_____

[5] Depending on the manner in which it was committed, aggravated assault does not necessarily require a showing that the victim actually suffered bodily injury. *See* TEX. PENAL CODE ANN. § 22.01(a)(2), (a)(3) (providing that a person commits assault if he "intentionally or knowingly threatens another with imminent bodily injury" or "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative"); *id.* § 22.02(a)(2) (stating a person commits aggravated assault if he commits assault as defined in § 22.01 while using or exhibiting a deadly weapon). The indictment did not specify the manner in which appellant allegedly committed aggravated assault. We assume for purposes of this opinion that, in order to show that appellant committed the completed offense of aggravated assault, the State needed to show that D.C. suffered bodily injury.

8

707 (Tex. Crim. App. 2008) ("Because the jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony."). The jury could have instead reasonably inferred—from evidence that appellant was hitting D.C. over the head while D.C. was protecting her head with her hands—that the scratches on D.C.'s hands were caused by appellant's assault.

In any event, the State did not need to prove that appellant actually caused D.C. to suffer bodily injury; instead, consistent with the indictment, it could have established the predicate felony offense by merely showing that appellant *attempted* to cause bodily injury to D.C. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). "A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." *Id.* § 15.01(a). The evidence showed that appellant was arguing with D.C. and pointed his gun at her before exiting the car and striking her with the gun. The jury could have reasonably inferred from this that appellant had the specific intent to cause bodily injury to D.C., whether or not she actually suffered such injury. *See id.* §§ 15.01(a), 19.02(b)(3).

Appellant further contends by this issue that "the act constituting the underlying felony and the act clearly dangerous to human life have merged, and thus could not support a conviction for felony murder." Appellant cites *Garrett v. State* for the proposition that "there must be a showing of felonious criminal conduct other than the assault causing the homicide" in a felony murder case. *See* 573 S.W.2d 543, 546 (Tex. Crim. App. 1978) (holding that application of the felony murder doctrine is improper where "[t]he aggravated assault and the act resulting in the homicide were one and the same").[6] However, the

---

[6] *Garrett* does not state, implicitly or explicitly, that the act constituting the underlying felony must

9

court of criminal appeals has since clarified that the rule elucidated in *Garrett* applies only "when the underlying felony is manslaughter or a lesser included offense of manslaughter." *Lawson v. State*, 64 S.W.3d 396 (Tex. Crim. App. 2001); *Johnson v. State*, 4 S.W.3d 254, 258 (Tex. Crim. App. 1999). Regardless, the act constituting the underlying felony in this case (hitting D.C. with a gun) is separate from the act which caused the homicide (the unintentional shooting of Ramos).

Appellant's first issue is overruled.

## B. Indictment

By his second issue, appellant argues that "[t]he indictment failed to charge felony murder properly" and the conviction is "invalid" because "valid and invalid charges [were] submitted to the jury." He contends that "the alternate charges in the felony murder indictment lack an essential element of the offense altogether—the mens rea" and that "if some jurors found [appellant] guilty of the merged murder (in the course of the aggravated assault) and some found him guilty of the non-existent injury to a child (in the course of injury to a child); we do not have a valid unanimous guilty verdict for felony murder."

Appellant does not cite authority regarding jury unanimity. *See* TEX. R. APP. P. 38.1(i). He does cite case law establishing that, in some circumstances, a verdict must be set aside when it cannot be determined whether the verdict was based on a constitutionally valid ground. *See Griffin v. United States*, 502 U.S. 46, 53 (1991) (noting that "where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground"). Appellant does not explain how his conviction is constitutionally prohibited

---

be separate from the "act clearly dangerous to human life" to support a felony murder conviction.

10

except to reiterate the arguments made in his first issue regarding the inconsistent definitions of "child" in the jury charge and the necessity of showing separate felonious conduct under *Garrett*. We have already rejected those arguments. Accordingly, we also reject appellant's second issue.

## C. Punishment Charge Error

Appellant contends by his third issue that the jury charge at the punishment phase incorrectly "exaggerated the effect of good conduct time on [his] sentence and parole" and caused him to suffer egregious harm.

### 1. Error

The charge in this case instructed the jury in relevant part as follows:

Under the law, applicable in this case the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

In regards to Count 1 under the law applicable in this case, if the defendant are [sic] sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served *plus any good conduct time earned* equals one-half of the sentence imposed or 30 years, whichever is less. Eligibility for parole does not guarantee that parole will be granted.

. . . .

It cannot accurately be predicted how the parole law and good conduct time might be applied to each [sic] defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to

11

consider the manner in which the parole law may be applied to this particular defendant.

(Emphasis added.) The State concedes that the italicized portion set forth above is erroneous. Instead, the jury should have been instructed that appellant would not become eligible for parole until he has actually served half of his sentence, or thirty years, whichever is less, "without consideration of any good conduct time he may earn." *See* Act of May 26, 1985, 69th Leg., R.S., ch. 576, § 1, 1985 Tex. Gen. Laws 2195, 2195 (amended 2019) (current version at TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a)) (requiring the inclusion of certain language regarding parole and good conduct time in a punishment charge for, among other offenses, murder).

## 2. Harm Analysis

Appellant's trial counsel did not object to the punishment charge. Therefore, the error requires reversal only if appellant suffered egregious harm as a result of the error. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Egregious harm will be found only if the error deprived the defendant of a fair and impartial trial. *Id.* The record must disclose actual rather than theoretical harm, and the error must have affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Id.* In reviewing for egregious harm, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

In *Igo v. State*, a sexual assault case, the Texas Court of Criminal Appeals considered a very similar charge error. 210 S.W.3d 645, 646 (Tex. Crim. App. 2006).

12

There, the jury was incorrectly instructed that the appellant "would not become eligible for parole until the actual time served, plus good [conduct] time, equaled one-fourth of the sentence imposed." *Id.* The jury should have been instructed that the appellant "would not become eligible for parole until the actual time served, *without considering good [conduct] time*, equaled *one-half* of the sentence imposed." *Id.* In concluding that the appellant did not suffer egregious harm as a result of the error, the Court stated:

> Although appellant did receive the maximum sentence, a number of other factors mitigate against a finding of egregious harm. First, the parole instruction contained the standard curative language admonishing the jury not to consider the extent to which the parole law might be applied to the defendant. Second, parole was not mentioned by either counsel during argument on punishment. And finally, the evidence relating to punishment was exceptionally strong.

*Id.* at 647. As to the strength of the punishment evidence, the Court noted in particular that "the jury could have viewed the sexual assault here as especially heinous because the victim was one of appellant's students"; that the appellant "continued a sexual relationship with the victim, even after he was indicted"; and that appellant "even tried to bribe [the victim] to drop the charges." *Id.*

Appellant argues that his case is instead analogous to *Hill v. State*, 30 S.W.3d 505, 508–09 (Tex. App.—Texarkana 2000, no pet.), and *Navratil v. State*, No. 05-97-01404-CR, 2001 WL 92688, at *3 (Tex. App.—Dallas Feb. 5, 2001, pet. ref'd) (not designated for publication), two cases where egregious harm was found to result from charge errors identical to the one presented here. In *Hill*, the appellant received a thirty-year sentence for aggravated robbery, a first degree felony punishable by up to ninety-nine years or life in prison. 30 S.W.3d at 508; *see* TEX. PENAL CODE ANN. §§ 12.32, 29.03(b). Despite the fact that the appellant did not receive the maximum sentence—and without discussing whether the charge contained the standard curative instruction or whether parole or good

13

conduct time were mentioned in arguments—the Texarkana court held that the trial court's "misstatement of the law . . . misled the jury and seriously affected how it viewed the existence of parole and good conduct time, which the instructions plainly told the jury it could consider." *Hill*, 30 S.W.3d at 508; *see id.* at 509 (noting that "[i]n some cases, erroneous jury instructions alone can demonstrate egregious harm"). The Dallas court in *Navratil*, citing *Hill*, held that the appellant suffered egregious harm because "the charge misapplied the law to the particular facts of this case and therefore failed to lead the jury to the 'threshold of its duty.'" *Navratil*, 2001 WL 92688, at *3 (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

However, following the submission of briefing in this case, the Texarkana court reconsidered and disavowed *Hill* in light of *Igo*. *Murrieta v. State*, 578 S.W.3d 552, 559 (Tex. App.—Texarkana 2019, no pet.) ("[W]e agree with our sister courts that *Hill* is no longer good law.") (citing *Robinson v. State*, No. 01-16-00565-CR, 2018 WL 454751, at *4 (Tex. App.—Houston [1st Dist.] Jan. 18, 2018, no pet.) (mem. op., not designated for publication) (recognizing *Hill* as abrogated); *Sosa v. State*, No. 13-12-00764-CR, 2015 WL 7352310, at *3 (Tex. App.—Corpus Christi–Edinburg Nov. 19, 2015, no pet.) (mem. op., not designated for publication) (declining to follow *Hill* and *Navratil*); *Ferguson v. State*, No. 05-14-00281-CR, 2015 WL 1883073, at *3 (Tex. App.—Dallas Apr. 24, 2015, no pet.) (mem. op., not designated for publication) (declining to follow *Hill*)).

Though *Hill* has been repudiated and *Igo* is controlling, that is not the end of our inquiry, because the record in this case differs significantly from that considered in *Igo*. Specifically, unlike in *Igo* and the other cases involving error in the parole and good conduct time instructions, here the State recited the erroneous instruction in its closing

14

argument at the punishment phase. The prosecutor began his argument as follows:

> May it please the Court, counsel, members of the jury, once again. I want to first say that I've know[n defense counsel] a long time. He has a tough job and he has done the best that he could with this case. It is very hard to represent a murderer. Somebody that cold-blooded killed somebody while they are pistol whipping their daughter. I think he has done a wonderful job. And the reason I say that is because this punishment phase is not about [defense counsel]. It is about this man, it is about what he did. It is not about how likeable or non-likeable [defense counsel] is. It is not about me and it is not about [the other prosecutor]. This is about [appellant]. That's what this is about. I want to make that clear. I want to also make something clear, going through this Charge again. I'm on page 3. I want to talk about the middle of the page. It talks about parole and the defendant and how it works. It says that "the defendant stands [sic] to a term of imprisonment will not become eligible for parole until the actual time served plus any good-conduct time earned equals one-half of the sentence imposed for 30 years, whichever is less." So let's break down what that means very quickly. What that means is that any person that is sentenced is [sic] 30 years or less they're eligible for parole. If you have a ten-year sentence, you would be eligible for parole in five and a half. Now, once you get into higher numbers, like 60 years, since 30 is half of that, then in 30 years you would be eligible for parole. Any number after 60, say 70 years, half of that would be 35. But since 30 is less than that, you still would be eligible for parole in 30 years. If you were sentenced to life in prison, you're still eligible in 30 years for parole. If you are sentenced to 99 years in prison, you are still eligible for parole in 30 years. 80 years, you are still eligible for parole in 30 years. So, that is what that explanation means on that part of the Charge.

Appellant contends that, by making this argument, the prosecutor "invited the jury to consider the manner in which the parole laws would be applied specifically" to him and rendered his trial unfair and partial.

We disagree. Although the prosecutor recited the parole instruction in his closing argument, he did not emphasize the erroneous portion of that instruction. In fact, the prosecutor disregarded the effect of good conduct time when giving examples of how the parole law would work in different sentencing scenarios. For example, without referencing the prospect of good conduct time, the prosecutor stated that "If you were sentenced to life in prison, you're still eligible in 30 years for parole," which is exactly what

15

the law calls for. Moreover, the prosecutor did not address how parole or good conduct time would apply specifically to this appellant. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (requiring jury to be instructed: "You are not to consider the manner in which the parole law may be applied to this particular defendant").

Additionally, the State makes a persuasive logical argument for why the jury was likely not considering the erroneous instruction when it assessed a life sentence. The State notes that, regardless of whether good conduct time would advance appellant's parole eligibility, the same minimum period for parole eligibility would apply for any sentence of sixty years or more. In other words, though the jury assessed a life sentence, appellant's parole eligibility would have been the same had it instead assessed a term of sixty or more years. As the State argues, this suggests that the jury did not base its sentencing decision on the fine details of good conduct time and parole law, but rather believed a maximum sentence was justified for other reasons.

With the above considerations in mind, and presuming that the jury followed the trial court's instruction not to consider the manner in which parole law might be applied to appellant, we conclude that appellant did not suffer egregious harm as a result of the erroneous punishment charge instruction. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) ("[W]e generally presume that a jury will follow the judge's instructions."); *see also Cueva v. State*, 339 S.W.3d 839, 853 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd) (finding that identical charge error did not cause egregious harm where "neither parole nor good conduct time was mentioned during punishment arguments").

Appellant's third issue is overruled.

16

**D.    Ineffective Assistance of Counsel**

To obtain a reversal of a conviction on grounds of ineffective assistance of counsel, a defendant must show that:  (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding.  *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"  *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687).  "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694).

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence.  *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).  Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy.  *See Strickland*, 466 U.S. at 689.  "We commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it."  *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005).  Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions.  *Thompson*, 9 S.W.3d at 813.

Appellant argues by his fourth issue that his counsel was ineffective by failing to

object to the above-referenced punishment charge error or to the prosecutor's recitation of the erroneous instruction during his punishment closing argument. Appellant notes that his trial counsel gave the following testimony regarding these alleged deficiencies at the motion for new trial hearing:

Q. [Appellate counsel]   Did you notice any error in the punishment charge?

A. [Trial counsel]   No, sir.

Q.   [The prosecutor], in the punishment closing argument, he actually argued the punishment charge, correct?

A   Yes.

Q.   When he argued it, did you notice if there was any error in that punishment charge?

A.   No, sir.

Q.   So the reason for not objecting is you simply just didn't notice it?

A.   I'm afraid not.

Q.   Well, did you look at what the proper charge is on a 3G[7] offense under article 37[.]07 in the Code of Criminal Procedure?

A.   I did not take a look at that. . . .

Q.   So you didn't look at the 37[.]07 charge before this case?

A.   Before I began the case, no.

Q.   Are you aware of that, based on your expertise as a criminal defense attorney in town?

---

[7] Referring to former Texas Code of Criminal Procedure article 42.12, § 3g (current version at TEX. CODE CRIM. PROC. ANN. art. 42A.054(a) (listing offenses for which parole eligibility does not take into account good conduct time)).

18

A.                                   I am.  But I'm afraid I didn't.

Appellant contends that no sound trial strategy could justify trial counsel's actions.

In *Cueva*, we concluded that an identical punishment charge error did not cause egregious harm to the appellant.  *See* 339 S.W.3d at 853.  As here, the appellant in *Cueva* also argued that his trial counsel provided ineffective assistance by failing to object to the charge.  *See id.* at 878–79.  Cueva's trial counsel testified that his failure to object was "inadvertent"; he "read [the erroneous] portion, but the way it was phrased escaped [him] at the time."  *Id.* at 878.  We deferred to the trial court's finding that counsel's testimony was credible, and we concluded that the trial court did not err in determining that counsel's assistance was not ineffective.  *Id.* at 878–79 (citing *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006) (noting that the right to effective assistance of counsel merely ensures "reasonably effective" assistance, not perfect assistance)).  We further agreed with the trial court that counsel's alleged errors did not cause appellant to suffer prejudice, in part because "the charge instructed the jurors that they were not to consider how good conduct time and the parole law might be applied to Cueva" and "neither party argued the concept of good conduct time or how it might be considered in evaluating parole eligibility."  *Id.* at 879.

Assuming but not deciding that counsel provided ineffective assistance, we conclude that the deficiency did not prejudice appellant.  *Cueva* is largely similar to this case, with the main difference being that the prosecutor here recited the parole instruction during his punishment closing argument.  But, as noted in our discussion of appellant's third issue, the prosecutor did not emphasize the erroneous portion of the instruction; instead, he provided examples which, consistent with the applicable law, disregarded the effect of good conduct time on parole eligibility.  And, again as set forth above, appellant's

19

parole eligibility would be the same if the jury had assessed a prison term of sixty or more years rather than life. There is no reason to believe the jury would have sentenced appellant to a term of less than sixty years had they been accurately instructed on the effect of good conduct time on appellant's parole eligibility. Thus, there is no reasonable probability that the result of the punishment phase of trial would have been different if counsel had objected to the charge. *See Napper*, 322 S.W.3d at 248.

Appellant's fourth issue is overruled.

## E. Trial Spectator Attire

By his fifth issue, appellant contends that the trial court erred by denying his objection to trial spectators wearing "expressive clothing and accessories showing support" for Ramos. The record reflects the following colloquy took place on the final day of the guilt-innocence phase of trial, after evidence had been heard but before closing arguments began:

> [Defense counsel]: Your Honor, the victim's family is in the courtroom wearing T-shirts with her face and in memory of Monica Rose Ramos. I'm concerned that may somehow influence the jury in their deliberation while we are going through closing arguments.
>
> THE COURT: [Prosecutor], your response?
>
> [Prosecutor]: My response is: First of all, I have nothing to do with them wearing their shirts. I think they have a first amendment right to wear whatever they want. I don't see what the problem is. But, of course, Judge, it is up to your discretion.
>
> THE COURT: I'm going to note your objection for the record, [defense counsel]. I'm not going to make them leave or take their shirts off.
>
> [Defense counsel]: Well, I'm not asking you to ask them to take their shirts off. I just don't want it to influence the jury.

20

THE COURT:        They are not going to be in the room with the jury when they are deliberating. They are only going to be here for the argument and for the reading of the Charge.

[Defense counsel]: Yes. But the influence during closing arguments and taking it back into that room.

THE COURT        I'm noting your—

[Prosecutor]:     And I am not trying to be sarcastic, but I think that the pictures and the exhibits are the ones that are more troublesome. I mean, I don't think the shirts are really going to be an impact. But that's just my opinion.

THE COURT:       Okay.

                 Are you ready?

[Prosecutor]:     Ready.

[Defense counsel]: Ready, Your Honor.

In his motion for new trial and on appeal, appellant argues that "[s]ymbolic clothing and accessories are inherently prejudicial" and that the trial court's ruling "hindered the possibility of his receiving a fair trial" and deprived him of his Sixth Amendment right to confront witnesses.[8] Appellant cites *Estelle v. Williams*, in which the United States Supreme Court observed that "an accused should not be compelled to go to trial in prison or jail clothing" because "[t]he defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." 425 U.S. 501, 504–05 (1976). He also cites *Norris v. Risley*, in which the Federal Ninth Circuit Court of Appeals held that the presence of spectators wearing "Women Against Rape" buttons presented an "unacceptably high" risk to the defendant's right to a fair trial "both by eroding the presumption of innocence and by allowing

---

[8] At the new trial hearing, appellant testified that "[a]bout 20 people or more" were wearing shirts with Ramos's picture.

21

extraneous, prejudicial considerations to permeate the proceedings without subjecting them to the safeguards of confrontation and cross-examination." 918 F.2d 828, 829, 834 (9th Cir. 1990). However, in *Carey v. Musladin*, the United States Supreme Court held that it was not "contrary to or an unreasonable application of clearly established federal law" for a state court to allow a murder victim's family to display buttons with the victim's image during trial. 549 U.S. 70, 77 (2006).

In *Howard v. State*, the Texas Court of Criminal Appeals explained that "spectator conduct or expression which impeded normal trial proceedings would not result in reversible error unless an appellant showed a reasonable probability that the conduct or expression interfered with the jury's verdict." 941 S.W.2d 102, 117 (Tex. Crim. App. 1996) (observing that "[t]he federal test and the test articulated by this Court are essentially interchangeable") (citing *Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985); *Ashley v. State*, 362 S.W.2d 847 (Tex. Crim. App. 1962)).

Here, the record shows merely that several spectators wore shirts depicting Ramos's face. There is nothing to indicate that normal trial proceedings were impeded or that the spectators did anything to attract the attention of the jurors. Without more, we cannot conclude that the trial court abused its discretion in implicitly determining there was no reasonable probability that the spectators' attire interfered with the jury's verdict. *See id.*; *see also Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017) ("An appellate court reviews a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if no reasonable view of the record could support the trial court's ruling.").

Appellant's fifth issue is overruled.

### III.  Conclusion

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 9th
day of January, 2020.